Wesley M. Griffith (SBN 286390)
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd., Suite 426
Long Beach, CA 90802
Telephone: (310) 896-5813
Email: wes@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone (708) 437-6476
Email: david@almeidalawgroup.com
**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN HASTINGS, *individually on behalf of himself and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>INKITT, INC.<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR MONETARY AND INJUNCTIVE RELIEF**<br><br>**Jury Trial Demanded** |

Plaintiff John Hastings ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Inkitt, Inc. ("Inkitt" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and other related entities. Plaintiff alleges the following on information and belief, except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. Privacy is a cornerstone of human dignity. The American legal system has consistently recognized that what a person watches, reads, or does in private should not be subject to unwarranted surveillance. Social media companies and their online marketing affiliates stand to gain by surveilling internet users and repurposing their data for hyper-targeted marketing and advertisement. Web-based technologies routinely infringe on these rights by intercepting user information and selling this data to advertising companies.

2. Galatea, an app owned by Inkitt (the "App"), purports to be an avenue for self-published authors to publish their fictional stories. However, this app launders private user data by tracking every title and chapter a reader opens and disclosing that reading history to advertisers and data-brokerages without consent.

3. Inkitt began intercepting user data before ever asking for consent. Through its App, it rents, exchanges, or otherwise discloses its customers' information, including personally identifying information along with titles of publications read or subscribed to (collectively "Personal Reading Information" or "Reading Information") to data aggregators, marketing and retargeting companies, and other third parties.

4. Defendant's practice of disclosing its users' Personal Reading Information from their Galatea App—including titles read, reading habits, and genre preferences—to third parties without explicit consent directly violates the privacy rights that protections like the California Reader Privacy Act were specifically designed to safeguard.

5. By sharing Galatea app users' reading data with data brokers and marketing partners, Defendant undermines the legislative intent of the California Reader Privacy Act, which acknowledges

that people should be free to read without fear of surveillance or having their literary preferences cataloged and monetized.

6. The harm caused by Defendant's disregard for reader privacy is exactly what legislators sought to prevent—the chilling effect on intellectual freedom when readers know their personal reading choices might be collected, tracked, shared, and used to profile them without their knowledge or explicit permission.

7. Plaintiff brings this action against Defendant on his own behalf and the members of the Class who used the App and whose Personal Reading Information was disclosed without consent.

## PARTIES

8. Plaintiff John Hastings is a natural person residing in Denton, Texas.

9. Defendant Inkitt, Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Inkitt owns and operates the App.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

10. **Subject Matter Jurisdiction:** This Court has Subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because the proposed class exceeds 100 members; Plaintiff John Hastings is a citizen of Texas; Defendant is a citizen of California, and the amount in controversy is greater than $5 million, exclusive of interest and costs.

11. **Personal Jurisdiction:** The Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in California.

12. **Venue:** Venue is proper in this District pursuant to 28 U.S.C. §1391 and 28 U.S.C. § 84(a) because Defendant maintains its principal place of business in this Judicial District, does substantial business in this Judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

13. **Divisional Assignment:** Assignment of this action to the San Francisco Division is proper because it arises in San Francisco County, Defendant maintains its principal place of business in this county, and the alleged unlawful conduct primarily took place in this county.

# FACTUAL BACKGROUND

## I. CALIFORNIA PROTECTS PERSONAL READING INFORMATION

### A. Personal Reading Information Is Confidential Under California Law

14. The books, articles, and chapters a person chooses to read disclose sensitive facts about politics, religion, health, and sexuality.

15. Courts have recognized a First Amendment interest in keeping reading records private that would have exposed customers' book-purchase histories.[1]

16. Prompted by those cases and the rapid shift to e-books, California enacted the Reader Privacy Act in 2011. Authored by Senator Leland Yee and backed by groups including the American Civil Liberties Union and Electronic Frontiers Foundation, the measure updated long-standing library-confidentiality rules for the digital era, ensuring that "digital book upgrades do not lead to reader-privacy downgrades."[2] Governor Jerry Brown signed the bill on October 2, 2011, and it took effect January 1, 2012.

17. The Act bars any "book service" provider, whether a library or neighborhood bookstores or mobile-reading apps, from disclosing information that links a specific reader to particular written material, absent the reader's affirmative consent or a court order. CA Civ. Code § 1798.90.

18. Even when disclosure is ordered, the statute imposes minimization, notice (subject to delayed notice in criminal matters), and annual transparency-reporting requirements.

19. By extending library-style protections to modern reading platforms, the Act safeguards Californians—and anyone whose data are routed through a California-based provider—from the chilling effects of surveillance and uncontrolled data brokering.

### B. Plaintiff's Personal Reading Information Has Economic Value

20. The United States digital-advertising economy runs on the raw material of users' web-browsing histories. In 2024 alone that market generated a record $259 billion in revenue–more than triple

---

[1] *See e.g. In re Grand Jury Subpoena to Amazon.com*, 246 F.R.D. 570, 572–73 (W.D. Wis. 2007).

[2] *Good News for Reader Privacy: Reader Privacy Act Passes Senate Judiciary Committee*, https://www.aclunc.org/blog/good-news-reader-privacy-reader-privacy-act-passes-senate-judiciary-committee (last accessed July 30, 2025).

its size a decade ago–and industry analysts attribute nearly all of that growth to ever-finer audience targeting made possible by behavioral tracking.[3]

21. That targeting supply chain begins with data-broker firms that buy, combine, and resell granular click-stream and location logs. The Federal Trade Commission recently barred certain brokers from selling those dossiers, calling the records "highly sensitive" and noting that they reveal where people live, work, and worship.[4] The enforcement actions underscore a simple economic truth: detailed browsing data are worth real money.

22. A September 2024 study from the Federal Trade Commission found that large social-media and streaming platforms "collect" and "indefinitely retain troves of data," including brokered browsing information, to feed what the agency described as a broad surveillance economy.[5]

23. Consumers grasp both the value of that data and the risk of losing control over it. A 2023 Pew Research Center survey reported that 81 percent of American adults are concerned about how companies use their personal data, while 67 percent admit they understand "little to nothing" about what is being collected.[6]

24. That concern drives demand for stronger privacy safeguards, which California supplies through its privacy protections.

**C. CIPA Protects California Residents' Privacy in Online Communications**

25. The California Legislature enacted CIPA to protect certain privacy rights of California citizens.

---

[3] Interactive Advertising Bureau & PricewaterhouseCoopers, Internet Advertising Revenue Report: Full Year 2024 4 (Apr. 17, 2025), https://www.iab.com/insights/internet-advertising-revenue-report-full-year-2024/ (last accessed July 30, 2025).

[4] Press Release, *Fed. Trade Comm'n, FTC Takes Action Against Gravy Analytics and Venntel for Unlawfully Selling Location Data* (Dec. 12, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/12/ftc-takes-action-against-mobilewalla-collecting-selling-sensitive-location-data (last accessed July 30, 2025).

[5] Fed. Trade Comm'n, 6(b) Staff Report: Social Media & Video Streaming Service Data Practices 12 (Sept. 19, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/09/ftc-staff-report-finds-large-social-media-video-streaming-companies-have-engaged-vast-surveillance (last accessed July 30, 2025).

[6] Pew Research Center, "How Americans View Data Privacy" (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/ (last accessed July 30, 2025).

26. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

27. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

28. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

29. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability and creates a private right of action for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978).

30. Specifically, CIPA § 631(a) prohibits any person or entity from:

> intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire . . .
>
> willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or . . .
>
> us[ing], or attempt[ing] to use … any information so obtained.

31. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

32. The California Legislature also enacted CIPA § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

33. A "confidential communication" for the purposes of CIPA §632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code §632(c).

34. Individuals may bring an action against the violator of Cal. Penal Code §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2.

## II. ITERABLE, INC. IS A DATA BROKER THAT INTERCEPTS PERSONAL READING INFORMATION FOR CROSS-CHANNEL MARKETING

35. Iterable, Inc. ("Iterable") markets itself as a "cross-channel marketing platform that powers unified customer experiences" by ingesting every event an app records—page views, clicks, purchases—and attaching those events to a single profile keyed to a persistent user ID.[7]

36. Beyond simply analyzing user data, Iterable "empowers marketers to create, optimize and measure relevant interactions and experiences customers love."[8]

37. Brands use Iterable to trigger automated messages and to "measure relevant interactions" across email, push, SMS, and paid-media channels.[9]

38. California recognized the potential of this industry to infringe on user privacy in passing the Data Broker Law, which restricts the way data brokers may collect information from internet users. *See* Cal. Civ. Code §1798.99.80.

---

[7] *What Is Cross-Channel Campaign Management?*, https://iterable.com/resources/articles/cross-channel-marketing/general/what-is-cross-channel-campaign-management/ (last accessed July 30, 2025).

[8] *Id.*

[9] *Real-Time Personalization: What It Is & How It Works*, https://iterable.com/resources/articles/customer-experience/personalization/what-is-real-time-personalization/ (last accessed July 30, 2025).

39. The California Privacy Protection Agency has made data-broker compliance an enforcement priority, launching investigative sweeps and settling multiple actions since late 2024.[10]

40. Iterable is just the kind of company that California has sought to restrict. It collects information specific to users from apps across the web, including the one Defendant operates, along with custom parameters derived from these apps to build detailed profiles about a person's habits and preferences.

41. Its marketing copy explains that the platform "ingests, integrates, and unifies real-time data from any source—fueling [the] platform's ability to make instant, intelligent decisions with greater accuracy and impact."[11]

42. Here, those parameters include the exact title being read and a user's reading history, along with other data culled from the App.

43. The specific facts about a user's app use are valuable data which, in conjunction with identifying information like a User ID, allows Iterable or any company to whom it sells this data to directly target consumers based on their browsing choices.

44. Iterable helps websites gather this private data, including Personal Reading Information, through a portfolio of native software development kits ("SDK")[12], application program interfaces ("API")[13] and more than 120 integrations which "use data captured on web and mobile to power real-time customer-engagement campaigns across email, social, push, SMS and in-app."[14]

45. Iterable's mobile product page further touts that brands can "create a cross-channel experience that seamlessly move between channels-without ever losing connection," reaching users through push, in-app, SMS, mobile web, and a persistent Mobile Inbox.[15]

---

[10] *See* Cal. Privacy Prot. Agency, CPPA Settles With First Set of Data Brokers (Nov. 14, 2024), https://cppa.ca.gov/announcements/2024/20241114.html (last accessed July 30, 2025).

[11] *See* https://iterable.com/product/ (last accessed July 30, 2025).

[12] *See What is an SDK?*, https://www.redhat.com/en/topics/cloud-native-apps/what-is-SDK (last accessed July 30, 2025).

[13] *See What is a Rest API?,* https://www.redhat.com/en/topics/api/what-is-a-rest-api (last accessed July 30, 2025).

[14] *Segment*, https://partnerships.iterable.com/partners/technology/segment (last accessed July 30, 2025).

[15] *How Iterable + Meta Custom Audiences Can Attract New Users* (Nov. 2, 2022), https://iterable.com/blog/how-iterable-meta-custom-audiences-can-attract-new-users/ (last accessed July 30, 2025).

46. By funneling Galatea readers' title selections and unique IDs into Iterable's brokerage pipeline without informed consent, Inkitt exposes its readers to precisely the kind of secondary commercial exploitation that privacy laws were designed to curb.

## III. INKITT UNLAWFULLY DISCLOSES ITS CUSTOMERS' PERSONAL READING INFORMATION

47. The App is a popular self-publishing platform available in Apple's App Store and Google Play.

48. When a consumer downloads the App, the only prompt displayed is an age-gate screen.



49. The user is then taken directly into the story-selection interface without having to create an account, log in, or view any terms of use or privacy policy. As seen in the screenshot below, users may begin reading e-books on their devices immediately.



50. Each time a reader previews or opens a title in the App, it silently sends an HTTP POST request to api.iterable.com, a domain operated by Iterable.

51. That transmission contains a persistent "userId", which is used to uniquely identify and track the reader across apps. Here, "userID" parameter is transmitted alongside an "activeStory" parameter, which reveals the exact title being read (i.e. the title "Three: The Perfect Number" seen above is transmitted to Iterable in the "activeStory" parameter, as seen below).



52. The SDK also transmits a device identifier (which specifically identifies the smartphone device from which a user has accessed the App), geographic information, and other data which can be used to triangulate a user's identity to Iterable, using an identification technique known as "digital fingerprinting."[16]

53. Iterable's business model is to merge the identifiers it collects with additional information it acquires from other sources, creating detailed behavioral profiles that it licenses to more than a thousand commercial partners.

54. By transmitting the "userID" parameter side-by-side with the reader's current title, Inkitt enables third parties to link an individual's real-world identity to that specific reading choice– conduct squarely prohibited by privacy laws like the Reader Privacy Act.

55. By and through these actions, Defendant has intentionally disclosed to third parties its customers' Personal Reading Information without consent.

**IV. REPRESENTATIVE PLAINTIFF JOHN HASTINGS' EXPERIENCE**

56. Plaintiff John Hastings is and at all relevant times has been a resident of Denton, Texas. Plaintiff downloaded the App in early May 2025 and viewed at least one title, an e-book entitled "Half of my Heart," on the app after downloading it.




[16] *See* Ruth Ikwu et al., *Digital Fingerprinting for Identifying Malicious Collusive Groups on Twitter*, 9 J. CYBERSECURITY 1 (2023), https://doi.org/10.1093/cybsec/tyad014 (last accessed July 30, 2025).

57. Plaintiff never created an account on the App or with any related entity owned by Inkitt.

58. During Plaintiff's use of the App, Defendant disclosed the title of the book or books he read and viewed, a unique identifier, and other information to Iterable, among other possible undisclosed third parties.

59. Defendant disclosed this information and other browsing and viewing data to at least Iterable, possibly along with other undisclosed third parties, every time Plaintiff used the App.

60. Plaintiff did not consent to the disclosure of his Reading Information, in writing or otherwise, and Defendant did not attempt to obtain Plaintiff's consent in a form separate and distinct from other legal and financial obligations.

61. Defendant did not provide Plaintiff with an opportunity to withdraw from the disclosure of his Reading Information.

62. Plaintiff was harmed by not having the ability to opt out of Defendant's data sharing scheme and lost control over his personal information as a result.

63. Because Defendant never clearly and conspicuously notified him it was even sharing his data with unauthorized third parties, including at least, Iterable, he never even had reasonable notice that such data collection was even taking place, let alone what steps he could take to control it.

## V. TOLLING AND ESTOPPEL

64. California's delayed-discovery rule postpones accrual of a claim until the plaintiff, exercising reasonable diligence, could have discovered the factual basis for the wrongdoing.

65. Here, Defendant's disclosures were invisible: the App's network calls to Iterable were made in the background, carried only in encrypted HTTPS payloads, and triggered without any opt-in screen or mention in the limited splash-page text the user saw.

66. Because neither Plaintiff nor any reasonable consumer had the expertise or packet-inspection tools required to detect those hidden transmissions, they could not have discovered the violations until alerted to the issue in 2025.

67. Defendant also took affirmative steps that amount to fraudulent concealment namely through public-facing privacy materials that touted "reader privacy" without revealing that every title opened was paired with a persistent identifier and shared with a third-party marketing broker.

68. Under California law, a defendant who conceals its misconduct or makes partial, misleading disclosures is estopped from invoking a statute of limitations that would otherwise bar suit.

69. Equitable tolling applies for an additional reason: Defendant's conduct was inherently undiscoverable and entirely within its exclusive control.

70. Plaintiff exercised due diligence by reviewing available privacy notices, monitoring device settings, and relying on industry-standard expectations that reading choices remain confidential. But no amount of diligence could have uncovered the concealed API traffic until independent forensic analysis became publicly available.

71. Accordingly, under the doctrines of delayed discovery, fraudulent concealment, and equitable tolling, the limitations periods for the Unfair Competition Law, CIPA § 632(a), and unjust-enrichment claims did not begin to run until Plaintiff first learned of the hidden data transmissions in 2025.

## CLASS ACTION ALLEGATIONS

72. Plaintiff brings this class action under Fed. R. Civ. P. 23, individually and on behalf of all members of the following Class:

> All United States residents who downloaded and used the App and whose Personal Reading Information was disclosed.

73. **Numerosity** (Fed. R. Civ. P. 23(a)(1)): The Class is composed of at least thousands of individuals, the joinder of whom in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

74. **Commonality** (Fed. R. Civ. P. 23(a)(2)): There is a well-defined community of interest in the questions of law and fact affecting the members of the proposed Class. Common questions include, but are not limited to, whether Defendant violated the California Invasion of Privacy Act ("CIPA"), Cal.

Penal Code §§ 631 and 632, and whether Plaintiff and the proposed Class are entitled to damages, reasonable attorneys' fees, pre-judgment interest, and costs of suit.

75. **Predominance** (Fed. R. Civ. P. 23(b)(3)): Questions of law and fact common to members of the Class predominate over any questions affecting only individual members. Specifically, the core factual and legal issues-such as whether Defendant's data collection practices involved unauthorized interception or disclosure of communications and whether such conduct violates CIPA-are common to all Class Members and capable of class wide resolution.

76. **Typicality** (Fed. R. Civ. P. 23(a)(3)): The claims of the named Plaintiff are typical of the claims of the Class because Plaintiff, like all other Class Members, visited the App and had their confidential electronic communications intercepted and disclosed to Iterable.

77. **Adequacy** (Fed. R. Civ. P. 23(a)(4)): Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff's interests are not antagonistic to those of the Class, and Plaintiff has retained competent counsel experienced in prosecuting data privacy and consumer protection class actions.

78. **Superiority** (Fed. R. Civ. P. 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Each individual Class Member may lack the resources to pursue their own claims, and individual litigation would be burdensome, duplicative, and inefficient. A class action avoids the risk of inconsistent outcomes and promotes judicial economy.

79. The class action mechanism presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Moreover, Defendant has acted or refused to act on grounds generally applicable to the Class, making appropriate final injunctive and declaratory relief concerning the Class as a whole.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

**Cal. Bus. & Prof. Code §§ 17200 et seq.**

**(*On Behalf of Plaintiff and the Class)***

80. Plaintiff realleges and incorporates by reference the preceding paragraphs as though fully set forth herein.

81. Inkitt's conduct constitutes "unlawful" business acts or practices because it violates the Reader Privacy Act and other privacy statutes and regulations incorporated into the UCL through the "borrowing" doctrine.

82. Inkitt's conduct is also unfair. A reasonable consumer expects that the act of reading a digital book will remain private unless the reader affirmatively opts in to disclosure.

83. Secretly monetizing that reading history—by pairing it with unique identifiers and selling or sharing it with data brokers—offends public policy, substantially harms consumers, and yields no countervailing benefit that consumers could not have achieved through less-intrusive means.

84. Plaintiff and the Class have lost money or property as a result of Inkitt's practices, including (a) the value of the personal data wrongfully appropriated and (b) amounts paid for app tokens, subscriptions, or in-app purchases that would not have been made had Inkitt fully disclosed its data-sharing scheme.

85. Pursuant to the UCL, Plaintiff seeks (a) equitable restitution of the value of the data and any other monies wrongfully obtained from Plaintiff and the Class; and (b) permanent injunctive relief prohibiting Inkitt from continuing the unlawful and unfair practices described above. Plaintiff also seeks attorneys' fees and costs where recoverable, including under Code Civ. Proc. § 1021.5.

**<u>SECOND CAUSE OF ACTION</u>**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**

**Cal. Penal Code § 631**

**(*<u>On Behalf of Plaintiff and the Class)</u>***

86. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

87. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

88. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

89. Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> [Or]
>
> [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> [Or]
>
> [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> [Or]
>
> [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

(paragraph breaks added).

90. CIPA § 631(a) is not limited to phone lines but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal.

Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

91. Iterable's API is a "machine, instrument, contrivance, or other manner" used to engage in the prohibited conduct at issue here. Cal. Penal Code § 631.

92. Iterable is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).

93. Further, Iterable had the capability to use the wiretapped information for its own purposes.

94. Accordingly, Iterable was a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.

95. At all relevant times, through their SDK embedded in the App, Iterable willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

96. At all relevant times, Iterable used or attempted to use the communications intercepted through the App to promote and improve its advertising platform.

97. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Iterable to wiretap Plaintiff and Class and to accomplish the wrongful conduct at issue here.

98. Plaintiff and Class Members did not provide their prior consent to Iterable for its intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.

99. Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Iterable's conduct.

100. The wiretapping of Plaintiff and Class Members occurred in California, where Defendant routed Plaintiff's and Class Members' electronic communications its servers and exposed their Personal Reading Information to Iterable.

101. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## THIRD CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT

### Cal. Penal Code § 632

### (*On Behalf of Plaintiff and the Class)*

102. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

103. Plaintiff brings this claim against Defendant individually and on behalf of the Class.

104. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

105. Iterable's web API is an "electronic amplifying or recording device" within the meaning of the statute.

106. At all relevant times, Defendant used Iterable to eavesdrop upon and record the confidential communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other.

107. When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy because App users would not have expected that Defendant or anyone else was recording and disseminating their browsing history without users' knowledge or consent.

108. Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that third-party entities like Iterable

would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

109. Plaintiff and Class Members did not consent to any of Iterable's actions. Nor have Plaintiff or Class Members consented to Iterable's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

110. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a), reasonable attorneys' fees and costs, and all other relief available at law or equity.

## FOURTH CAUSE OF ACTION

### UNJUST ENRICHMENT

***(On Behalf of Plaintiff and the Class)***

111. Plaintiff incorporates the preceding allegations as though fully set forth here.

112. The fair market value of the personal data and behavioral information, including Personal Reading Information, that Plaintiff and Class Members provided to Defendant is substantial, as evidenced by the multi-billion dollar data-broker industry and the significant investments that companies like Iterable make in data collection technologies.

113. Defendant obtained these valuable benefits through deceptive and secretive means, without providing clear notice to users that their data would be intercepted, collected, and monetized in real-time.

114. Plaintiff and Class Members provided these valuable benefits to Defendant without receiving any meaningful compensation, consideration, or equivalent value in return.

115. By surreptitiously transmitting readers' title selections and unique identifiers to Iterable and other third-party marketing services, Defendant derived substantial economic benefit in the form of (a) enhanced advertising and user-acquisition revenue, (b) higher in-app conversion rates generated by data-driven remarketing, and (c) the market value of the personal data itself.

116. That benefit was conferred directly by Plaintiff and Class members, whose Personal Reading Information supplied the raw material for Defendant's monetization scheme.

117. Plaintiff and the Class received no compensation for the use or sale of their data and would not have provided the information had Defendant disclosed its true practices.

118. Under principles of equity and good conscience, Defendant should not be permitted to retain the profits and other benefits obtained through its unlawful and unfair conduct.

119. Plaintiff, on behalf of the Class, seeks restitution and disgorgement of all revenues, profits, and other enrichment Defendant obtained as a result of its unauthorized collection, disclosure, and exploitation of readers' personal information, together with any other relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff John Hastings seeks a judgment against Defendant Inkitt, Inc., individually and on behalf of all others similarly situated, as follows:

A. An order certifying the proposed Class under Rule 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. A declaration that Inkitt's conduct, as alleged, violates (i) the California Unfair Competition Law, (ii) California Penal Code § 631, (iii) California Penal Code § 632, and (iv) the common-law doctrine of unjust enrichment;

C. Restitution and/or disgorgement of all monies or other benefits Inkitt wrongfully obtained from Plaintiff and the Class, including the independent value of their Personal Reading Information, as authorized by the Unfair Competition Law and principles of equity;

D. Actual, nominal, and—where authorized—statutory and punitive damages in an amount to be determined at trial;

E. Pre-judgment and post-judgment interest on all monetary awards, as permitted by law;

F. Permanent injunctive and declaratory relief requiring Inkitt to cease transmitting Personal Reading Information without informed, affirmative consent, to delete all such information previously disclosed, and to implement privacy safeguards;

G. An award of reasonable attorneys' fees and costs under applicable statutes, including California Code of Civil Procedure § 1021.5 and California Penal Code § 637.2; and

H. Such further relief as the Court deems just and proper.

Dated: July 31, 2025

Respectfully submitted,

By: */s/ Wesley M. Griffith*
Wesley M. Griffith (SBN 286390)
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd., Suite 426
Long Beach, CA 90802
Telephone: (310) 896-5813
Email: wes@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone (708) 437-6476
Email: david@almeidalawgroup.com

**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and Putative Class*

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Dated: July 31, 2025

Respectfully submitted,

By: */s/ Wesley M. Griffith*

Wesley M. Griffith (SBN 286390)
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd., Suite 426
Long Beach, CA 90802
Telephone: (310) 896-5813
Email: wes@almeidalawgroup.com

David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone (708) 437-6476
Email: david@almeidalawgroup.com

**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and Putative Class*